**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| FCP ENTERTAINMENT PARTNERS, LLC, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Civil Action No. 22-cv-02768-LAK |
| | ) | |
| HAL LUFTIG COMPANY, INC. and | ) | Action No. 1 |
| HAL LUFTIG, | ) | |
| | ) | |
| Respondents. | ) | |

|  |  |  |
|---|---|---|
| HAL LUFTIG, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | |
| | ) | Civil Action No. 22-cv-03697-LAK |
| FCP ENTERTAINMENT PARTNERS, LLC | ) | |
| | ) | Action No. 2 |
| Respondent. | ) | |

**OMNIBUS MEMORANDUM OF LAW IN FURTHER SUPPORT OF**
**FCP ENTERTAINMENT PARTNERS, LLC'S PETITION TO CONFIRM**
**ARBITRATION AWARD AND OPPOSITION TO HAL LUFTIG'S**
**PETITION TO VACATE ARBITRATION AWARD**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ ii

I. PROCEDURAL BACKGROUND.............................................................................. 1

II. INTRODUCTION .................................................................................................... 2

III. THE LUFTIG PARTIES MISAPPLY
THE APPLICABLE LEGAL STANDARD ................................................................. 3

    A. THE APPLICABLE LEGAL STANDARD
    PROVIDES FOR VERY LIMITED REVIEW
    OF THE FINAL AWARD ...................................................................................... 3

    B. THE LUFTIG PARTIES' ATTEMPT TO
    EXPAND THE FAA'S STANDARD OF REVIEW
    MUST BE REJECTED .......................................................................................... 4

IV. NO GROUNDS EXIST TO VACATE
THE FINAL AWARD.................................................................................................. 9

    A. THE ARBITRATOR DID NOT MANIFESTLY
    DISREGARD THE LAW IN FINDING LUFTIG JOINTLY
    AND SEVERALLY LIABLE WITH HLC FOR THE
    DAMAGES SUFFERED BY FCP ......................................................................... 9

        1. Both Parties Acknowledged During the Proceeding
        that FCP was Pursuing Claims Against Both Luftig and HLC
        for Breach of Contract and Against Luftig for Breach of Fiduciary
        Duty, Which Would Result in Joint and Several Liability ........................... 10

        2. The Arbitrator Appropriately Awarded Damages for
        Breach of Contract and Breach of Fiduciary Duty Against
        Luftig and HLC Jointly and Severally ....................................................... 12

        3. FCP Presented Overwhelming Evidence Supporting
        the Award of Damages for Luftig's Breach of Fiduciary
        Duty and Breach of Contract ..................................................................... 13

        4. The Question to Be Resolved Here is Not Whether
        the Arbitrator's Decision Was Correct or Incorrect; The
        Question is Whether the Arbitrator Manifestly Ignored the
        Law in Finding Joint and Several Liability ................................................. 15

B.  THE ARBITRATOR CORRECTLY CONCLUDED THAT
KINKY BOOTS REVENUE WAS "LLC INCOME" AND KINKY
BOOTS WAS A "VESTED PROJECT" UNDER THE 2007 AGREEMENT ........................... 16

    1.  Kinky Boots Revenue Was "LLC Income"
    Under Section 6 of the 2007 Agreement ..................................................... 17

    2.  Kinky Boots Was a Vested Project Under
    Section 8(e) of the 2007 Agreement .......................................................... 19

    3.  The Arbitrator Did Not Manifestly Ignore
    the Law in Finding That the Parties' Conduct Had
    Resulted in a Modification of the 2007 Agreement .................................... 21

C.  THE ARBITRATOR DID NOT MANIFESTLY IGNORE THE
LAW IN FINDING THAT THE 2007 AGREEMENT WAS NOT VOID
AS AGAINST PUBLIC POLICY PURSUANT TO CALIFORNIA
BUSINESS AND PROFESSIONS CODE §16600 ............................................................. 23

V.  CONCLUSION ........................................................................................................ 24

# TABLE OF AUTHORITIES

**Cases**

*Barbier v. Shearson Lehman Hutton Inc.*,
 948 F.2d 117 (2d Cir. 1991) .................................................................................. 4, 13

*Biller v. Toyota Motor Corp.*,
 668 F.3d 655 (9th Cir. 2012) .............................................................................. 7, 8, 9

*Cable Connection, Inc. v. DIRECTV, Inc.*,
 190 P.3d 586 (2008) .......................................................................................... 7, 8, 9

*Dean Witter Reynolds Inc. v. Byrd*,
 470 U.S. 213 (1985) ................................................................................................... 5

*D.H. Blair & Co., Inc. v. Gottdiener*,
 462 F.3d 95 (2d Cir. 2006) ............................................................................... 3, 4, 13

*Diamond Works v. Agreement Insurance*,
 109 Cal. App. 4th 1020 (2003) ................................................................................. 22

*Escopetrol S.A. v. Offshore Exploration and Production LLC*,
 46 F.Supp.3d 327 (S.D.N.Y. 2014) ........................................................................ 3, 4

*Hall St. Assocs., L.L.C. v. Mattel, Inc.*,
 552 U.S. 576 (2008) .......................................................................................... *passim*

*Ixchel Pharma LLC v. Biogen, Inc.*,
 9 Cal. 5th 1130 (2020) ......................................................................................... 23, 24

*Kyocera Corp. v. Prudential-Bache Trade Servs., Inc.*,
 41 F.3d 987 (9th Cir. 2003) ................................................................................ 6, 8, 9

*Landy Michaels RealtyCorp. v. Local 32B-32J*,
 954 F.2d 794 (2d Cir.1992) ........................................................................................ 4

*Loc. 1199, Drug, Hosp. & Health Care Emps. Union, RWDSU, AFL-CIO v. Brooks
Drug Co.*, 956 F.2d 22 (2d Cir. 1992)........................................................................ 4

*Major League Baseball Players Ass'n v. Garvey*,
 532 U.S. 504 (2001) .................................................................................................... 4

*Mastrobuono v. Shearson Lehman Hutton, Inc.*,
 514 U.S. 52 (1995) ...................................................................................................... 3

*McQueen-Starling v. UnitedHealth Grp., Inc.*,
 654 F. Supp. 2d 154 (S.D.N.Y. 2009)..................................................................... 8, 9

*Roadway Package Sys., Inc. v. Kayser*,
    257 F.3d 287 (3d Cir.2001) ........................................................................... 3

*Shaw Group Inc. v. Triplefine Int'l Corp.*,
    322 F.3d 115 (2d Cir.2003) ........................................................................... 3

*Stolt-Nielsen S.A. v. AnimalFeeds International Corp.*,
    559 U.S. 662 (2010) ............................................................................... 4, 16

**State Statutes**

California's Business and Professions Code §16600 .............................................. 3, 23, 24

California Arbitration Act ................................................................................ 5, 7, 8

## I.   Procedural Background

The present litigation arises out of the Final Award issued in the American Arbitration Association arbitration captioned as *FCP Entertainment Partners, LLC vs. Hal Luftig Company, Inc.*; and *Hal Luftig*, AAA Case No. 01-19-0002-5183 (the "Arbitration"), by AAA Arbitrator Bob Donnelly (the "Arbitrator"), a senior attorney at the Manhattan office of Fox Rothchild. After an extensive process of ranking and striking potential arbitrators, Mr. Donnelly was selected to preside over the dispute in large part because of his extensive and possibly unparalleled experience in the practice of entertainment, music, and theater law. With over 40 years of practice entirely devoted to intellectual property matters and contractual transactions in the field of entertainment law, Mr. Donnelly's credentials are impeccable. A copy of his AAA Arbitrator Panel Resume which was provided to the parties is attached as Exhibit 1 to the Declaration of Frank C. Gilmore ("Gilmore Dec.") filed concurrently herewith.

On April 4, 2022, FCP Entertainment Partners, LLC ("FCP") filed its Petition to Confirm the Arbitration Award (Action No. 1, Docs. 1; 3-6). On May 6, 2022, Hal Luftig Company, Inc. ("HLC") and Hal Luftig ("Luftig," and together with HLC the "Luftig Parties") filed their Opposition to the Petition (Action No. 1, Docs. 13-14). Simultaneous with the filing of the Opposition, on May 6, 2022, Luftig filed his Petition to Vacate the Arbitration Award as a separate action (Action No. 2, Doc. 1; 3-5).

On May 11, 2022, the Court entered an Order required an Amended Petition be filed to correct perceived deficiencies in both Petitions regarding subject matter jurisdiction (Doc. 16 and 11, respectively). On May 19, 2022, FCP and Luftig each filed Amended Petitions correcting the deficiencies (Doc. 21 and 14, respectively). On May 20, the Court Ordered via Memo Endorsement, among other things, that the previously filed Declarations and Memorandums

1

offered in support of, or in opposition to, the Petition be adopted and not refiled (Doc. 20 and 13, respectively). On June 7, 2022, the Court granted FCP's request to file a single omnibus brief in reply to the Luftig Parties Memorandum of Law in Opposition to FCP's Amended Petition and in opposition to Luftig's Amended Petition to Vacate (Doc. 24 and 17, respectively).

## II.    Introduction

On April 1, 2022, the Arbitrator issued the Final Award[1], which FCP now seeks to confirm. The Final Award incorporated an Interim Award and February 4, 2022, Order, in which the Arbitrator resolved all of the parties' disputes, including an award of damages on FCP's claims for breach of contract and breach of fiduciary duty against the Luftig Parties. The Final Award provided that: "Respondents shall pay Claimant the amount of $2,638,925.78 in the form of compensatory damages. Said amount shall be paid in full within thirty (30) days from the date of this Final Award." (Action No. 1, Doc. 5-1, at p. 4.).

In opposition to FCP's Petition to Confirm and in support of Luftig's Petition to Vacate, the Luftig Parties present five theories in an attempt to overcome the Final Award, none of which are sufficient to prevent confirmation. First, the Luftig Parties argue that the Final Award cannot be confirmed against Luftig, individually, because he was not a party to the 2007 Agreement. Second, the Luftig Parties contend that the arbitrator improperly pierced the corporate veil in finding Luftig jointly and severally liable. Third, the Luftig Parties argue that the Final Award cannot be confirmed because the Arbitrator improperly found that the 2007 Agreement had been modified by the parties' conduct. Fourth, The Luftig Parties contend that the Kinky Boots Broadway production was not a "Vested Project" under the 2007 Agreement and that the Arbitrator

---

[1] Capitalized terms shall have the same meaning as set forth in FCP's Memorandum of Law in Support of its Petition to Confirm the Arbitration Award (Action No. 1, Doc. 6).

abused his discretion in so holding. Lastly, the Luftig Parties contend that the Arbitrator erred by rejecting their attempt to invalidate the 2007 Agreement under California's Business and Professions Code §16600 prohibition on post-employment non-competition agreements. As set forth in greater detail below, the Luftig Parties have not shown a manifest disregard of the law, and, as such, each argument fails. In stark contrast, the Arbitrator, after significant briefing and consideration issued a well-reasoned Final Award that should be confirmed by this Court.

## III.    The Luftig Parties Misapply the Applicable Legal Standard

### A.    The Appliable Legal Standard Provides for Very Limited Review of the Final Award.

As an initial matter, the parties agree that the present dispute must be reviewed pursuant to the FAA and not pursuant to any state arbitration act. While the parties agree that the 2007 Agreement contains a California choice of law provision (Action No. 1, Doc. 5-2 at ¶12), it is important to note that a generic choice of law provision is insufficient to invoke state arbitration law. *See Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 58 n.2, 62 (1995); *see also Shaw Group Inc. v. Triplefine Int'l Corp.*, 322 F.3d 115, 123 (2d Cir.2003) (explaining that, under *Mastrobuono*, "the mere inclusion of a choice-of-law provision in an arbitration provision does not thereby incorporate state arbitration law"); *Roadway Package Sys., Inc. v. Kayser*, 257 F.3d 287, 296 (3d Cir.2001) (concluding that "general choice of law clause, standing alone, is insufficient to support a finding that the parties intended to opt out of the FAA's default standards" for vacatur).

"Under the FAA, "[a] party moving to vacate an arbitration award has the burden of proof, and the showing required to avoid confirmation is very high." *Escopetrol S.A. v. Offshore Exploration and Production LLC,* 46 F.Supp.3d 327, 340 (S.D.N.Y. 2014) (citing *D.H. Blair & Co., Inc. v. Gottdiener,* 462 F.3d 95, 110 (2d Cir. 2006)). "Accordingly, arbitral awards may only

be vacated on extremely limited grounds." *Escopetrol,* 46 F.Supp.3d at 340. Moreover, "'[n]either erroneous conclusions nor unsubstantiated factual findings justify federal court review' of an arbitral award under the FAA." For this reason, this Court must "adhere firmly to the proposition ... that an arbitration award should be enforced, despite a court's disagreement with it on the merits, if there is a barely colorable justification for the outcome reached." *Landy Michaels RealtyCorp. v. Local 32B-32J,* 954 F.2d 794, 797 (2d Cir.1992) (internal quotations omitted); *see also Loc. 1199, Drug, Hosp. & Health Care Emps. Union, RWDSU, AFL-CIO v. Brooks Drug Co.,* 956 F.2d 22, 25 (2d Cir. 1992) ("[T]he court is forbidden to substitute its own interpretation even if convinced that the arbitrator's interpretation was not only wrong, but plainly wrong."). "The arbitrator's rationale for an award need not be explained, and the award should be confirmed 'if a ground for the arbitrator's decision can be inferred from the facts of the case.'" *D.H. Blair & Co.,* 462 F.3d at 110 (quoting *Barbier v. Shearson Lehman Hutton Inc.,* 948 F.2d 117, 121 (2d Cir. 1991)). "It is only when [an] arbitrator strays from interpretation and application of the agreement and effectively 'dispense[s] his own brand of industrial justice' that his decision may be unenforceable." *Stolt-Nielsen S.A. v. AnimalFeeds International Corp.,* 559 U.S. 662, 671 (2010) (citing *Major League Baseball Players Ass'n v. Garvey,* 532 U.S. 504, 509 (2001)).

**B.    The Luftig Parties' Attempt to Expand the FAA's Standard of Review Must be Rejected.**

Knowing they cannot carry this heavy burden, the Luftig Parties attempt to stretch the FAA's standard for confirming or vacating an award by arguing that the relevant arbitration clause expands this Court's ability to review. Specifically, the Luftig Parties rely on the arbitration clause of the 2007 Agreement in contending that this Court has been vested authority by the parties to review the arbitrator's alleged "errors of law or legal reasoning." (Action No. 2, Doc. 1, ¶79). The Agreement provides that "The arbitrator shall not have the power to commit errors of law or legal

4

reasoning, and the award may be vacated or corrected for any such error." (Action No. 1, Doc. 5-2, ¶16) The Luftig Parties' arguments, however, are entirely without merit. As set forth below, the Luftig Parties misinterpret the Supreme Court's decision in *Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576 (2008) and inappropriately rely on a California Supreme Court case interpreting the California Arbitration Act ("CAA") – not the FAA.

First, the Luftig Parties rely upon the Supreme Court's decision in *Hall Street*, to argue that the scope of allowable review pursuant to the FAA could be expanded by the parties' contractual agreement. In so doing, the Luftig Parties misstate the clear holding of *Hall Street* which rejected the notion that broader review of an arbitration award could be authorized by mere agreement of the parties. *Hall Street*, 552 U.S. at 578 ("[t]he question here is whether statutory grounds for prompt vacatur and modification may be supplemented by contract. We hold that the statutory grounds [as provided in the FAA] are exclusive.").

In *Hall Street*, the plaintiff argued that the arbitration agreement's authorization "to review [arbitration decisions] for legal error ought to prevail . . . because arbitration is a creature of contract, and the FAA is 'motivated, first and foremost, by a congressional desire to enforce agreements into which the parties ha[ve] entered.'" *Hall Street*, 552 U.S. at 585-86 (quoting *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 220 (1985)). However, in response, the Court bluntly concluded: "again, we think th[is] argument comes up short . . . [and] that the text compels a reading of the §§ 10 and 11 categories as exclusive." The Court looked to the language in sections 9 through 11 of the FAA, against the backdrop of the axiomatic principles of statutory construction, explaining:

> To begin with, even if we assumed §§ 10 and 11 could be supplemented to some extent, it would stretch basic interpretive principles to expand the stated grounds to the point of evidentiary and legal review generally. Sections 10 and 11, after all, address

> egregious departures from the parties' agreed-upon arbitration:
> "corruption," "fraud," "evident partiality," "misconduct,"
> "misbehavior," "exceed[ing] ... powers," "evident material
> miscalculation," "evident material mistake," "award[s] upon a
> matter not submitted"; the only ground with any softer focus is
> "imperfect[ions]," and a court may correct those only if they go to
> "[a] matter of form not affecting the merits." Given this emphasis
> on extreme arbitral conduct, the old rule of *ejusdem generis* has an
> implicit lesson to teach here . . . surely a statute with no textual hook
> for expansion cannot authorize contracting parties to supplement
> review for specific instances of outrageous conduct with review for
> just any legal error. "Fraud" and a mistake of law are not cut from
> the same cloth.

*Hall Street,* 552 U.S. at 586.

The Supreme Court then observed that expanding the enumerated categories of sections 10 and 11, "would rub too much against the grain" of the language in Section 9, "where provision for judicial confirmation carries no hint of flexibility." *Id.* at 587. Specifically, the Majority Opinion looked to the statutory text of section 9, which requires that a court "must grant" the order consistent with the arbitral award "unless the award is vacated, modified, or corrected as prescribed in section 10 and 11 of this title." *Id.* (citing 9 U.S.C. § 9). "There is nothing malleable about 'must grant,' which unequivocally tells courts to grant confirmation in all cases, except when one of the 'prescribed' exceptions applies. . . this does not sound remotely like a provision meant to tell a court what to do just in case the parties say nothing else." *Hall Street,* 552 U.S. at 587. "Instead of fighting the text, it makes more sense to see the three provisions, §§ 9–11, as substantiating a national policy favoring arbitration with just the limited review needed to maintain arbitration's essential virtue of resolving disputes straightaway." *Id.* (further noting that "[a]ny other reading opens the door to the full-bore legal and evidentiary appeals that can 'rende[r] informal arbitration merely a prelude to a more cumbersome and time-consuming judicial review process . . .'") (citing *Kyocera Corp. v. Prudential-Bache Trade Servs., Inc.*, 341 F.3d 987, 998 (9th Cir. 2003)).

The Luftig Parties attempt to overcome the plain holdings of *Hall Street,* by relying upon the California Supreme Court's decision in *Cable Connection, Inc. v. DIRECTV, Inc.,* 190 P.3d 586 (2008). In *Cable Connection,* the California Supreme Court reasoned that the arbitration agreement represented the true intention of the parties in agreeing upon the course and scope of arbitration, and that the inclusion of a provision that read "the arbitrators shall not have the power to commit errors of law or legal reasoning, and the award may be vacated or corrected on appeal to a court of competent jurisdiction for any such error," was enforceable and provided the requisite authority to review an arbitrator's award on the merits.

Critically, however, the California Supreme Court's holding in *Cable Connection* was limited to interpretation of the California Arbitration Act ("CAA") and not the FAA's standard of review. *See Biller v. Toyota Motor Corp.,* 668 F.3d 655, 664-65 (9th Cir. 2012) ("[plaintiff's] reliance on *Cable Connection* . . . is misplaced because the FAA governs the arbitration agreement, as we have already decided . . . [and] in *Cable Connection* the California Supreme Court considered an arbitration agreement under the CAA."). Accordingly, *Cable Connection* is clearly inapposite here. Despite the existence of similar language in the 2007 Agreement purporting to authorize a review of legal error – akin to the clause examined in *Cable Connection* – the Ninth Circuit Court of Appeals has confirmed that *Cable Connection* applies only to the CAA and as the *Biller* Court concluded, the Petitioner's reliance on *Cable Connection* here is likewise misplaced, given that it is undisputed that the FAA (and not the CAA) governs the arbitration in this case. (*See* Action No. 2, Doc. 1, ¶8)

In *Biller*, the Ninth Circuit drew a clear distinction between how the interpretation of such a clause should be made under the FAA, as compared to the CAA. *Biller,* 668 F.3d at 664-65 ("In light of our conclusion that the FAA governs judicial review of the Severance Agreement, the

California Supreme Court's decision in *Cable Connection* is inapposite to the facts presented here."). Underscoring its decision, the *Biller* Court first observed that:

> The California Supreme Court [in *Cable* Connection] relied on the United States Supreme Court's statement in *Hall Street* that "[t]he FAA is not the only way into court for parties wanting review of arbitration awards: they may contemplate enforcement under the state statutory or common law, for example, where judicial review of a different scope is arguable," . . . to conclude that *Hall Street* did not foreclose a more searching merits review of arbitral awards when done so under authority other than the FAA.

*Id.* Accordingly, the *Biller* Court ultimately concluded that since:

> The state supreme court went on to hold [in *Cable Connection*] that "the CAA established the statutory grounds for judicial review with the expectation that arbitration awards are ordinarily final and subject to a restricted scope of review, . . . [but that] parties may . . . provid[e] for review of the merits in the arbitration agreement." . . . The parties here might have chosen to expand the scope of judicial review by providing for a merits review of the arbitration award and designation of the California Arbitration Act as controlling law under which review of an arbitral award can occur. [However,] [t]hey did not do so. Instead, they specified that the FAA governed the arbitration provision. In keeping with our precedent in *Kyocera,* the parties, by choosing the FAA as the vehicle for judicial review, may not by contract expand the scope of judicial review beyond that which the FAA authorizes.

*Biller,* 668 F.3d at 665 (citing *Kyocera,* 341 F.3d at 994) ("[W]e hold that private parties may not contractually impose their own standard on the courts.").

This Court in *McQueen-Starling v. UnitedHealth Grp., Inc.*, 654 F. Supp. 2d 154 (S.D.N.Y. 2009) reached the same conclusion when it rejected petitioner's attempt to displace the FAA standard of review. There, the Court rejected petitioner's reliance on *Cable Connection*, reasoning as follows:

> But in *Cable Connection*, which involved state court review of an arbitration award, the California State Supreme Court merely held that "the *Hall Street* holding is restricted to proceedings to review arbitration awards under the FAA, and does not require state law to

> conform with its limitations." Thus, *Cable Connection* has no
> bearing on this case, because it addressed the question of whether
> after *Hall Street*, a state must conform its own standard for
> reviewing arbitration awards to the FAA standard, while this case
> concerns the separate question of whether parties to an arbitration
> agreement that falls within the FAA may contract to compel a
> federal court to ignore the FAA standard of review and adopt a
> different standard of review.

*McQueen-Starling*, 654 F. Supp. 2d at 163, n. 7 (internal citations omitted).

Here, and as is noted above, the parties mutually agreed for the arbitration to be governed by the FAA. In fact, both parties have invoked the FAA in seeking to confirm and vacate the Final Award. Therefore, the holdings in *Biller* and *McQueen-Starling* are dispositive. Since the finite and limited scope of review available to arbitral awards under the FAA is well-established, additional scrutiny of the legal or factual merits of the subject arbitration award is not available. *See, e.g., Biller,* 668 F.3d at 664-65; *Hall Street,* 552 U.S. at 585-592; *Kyocera,* 341 F.3d at 1003 ("Private parties have no authority to dictate the manner in which the federal courts conduct judicial proceedings. Here, because Congress has determined that federal courts are to review [FAA] arbitration awards only for certain errors, the parties are powerless to select a different standard of review"). In light of the foregoing, and consistent with the Supreme Court's opinion in *Hall Street* the Luftig Parties are foreclosed from seeking to broaden the scope of permissible review of arbitration awards, inasmuch as the FAA (as interpreted pursuant to California law) governs the subject arbitration. Accordingly, the Final Award should be confirmed as issued.

## IV.   No Grounds Exist to Vacate the Final Award

### A.   The Arbitrator Did Not Manifestly Disregard the Law in Finding Luftig Jointly and Severally Liable with HLC for the Damages Suffered by FCP.

The Luftig Parties raise two separate arguments in support of their contention that the Arbitrator exhibited manifest disregard of the law in finding Luftig and HLC jointly and severally

liable for FCP's damages. Luftig first contends that the Arbitrator improperly found that Luftig was a party to the 2007 Agreement and therefore found him to be individually liable despite not being a party to the contract. Luftig then contends that "the only ground on which to hold Hal Luftig personally liable" was through a piercing of the corporate veil. (Doc 14, p.18). Neither of these arguments contain merit, let alone establish that the Arbitrator exhibited manifest disregard of the law.

### 1. Both Parties Acknowledged During the Proceeding that FCP Was Pursuing Claims Against Both Luftig and HLC for Breach of Contract <u>and</u> Against Luftig for Breach of Fiduciary Duty, Which Would Result in Joint and Several Liability.

On August 12, 2019, FCP commenced a Commercial Arbitration action by submitting a Demand for Arbitration with the American Arbitration Association. (Action No. 1, Doc. 5-4). Attached to the demand was a copy of a Complaint filed in the Superior Court of the State of California, Los Angeles County on July 23, 2019, containing factual allegations and legal claims for relief against both Hal Luftig, individually, and his company Hal Luftig Company, Inc. *Id.* In the Arbitration Demand, FCP alleged that both Luftig and HLC had breached the 2007 Agreement, and that Hal Luftig, as President of FCP, breached his fiduciary duty to FCP. FCP prayed for general and special damages against "Defendants" (plural) in an amount to be determined at trial. Specifically, FCP alleged under the "Breach of Contract" cause of action that "Defendants additionally breached the Contract by diverting and retaining funds due and owing to [FCP]." *Id*. at ¶53. In the Luftig Parties' Answer and Counterclaim, they denied liability on FCP's claims and they counterclaimed for breach of the 2007 Agreement and defamation, among other things (Action No. 1, Doc. 5-5). From the date of the filing of the Arbitration Demand in 2019 until after the hearing concluded, at no point during the extensive discovery and dispositive motion practice did the Luftig Parties ever seek dismissal of the breach of fiduciary duty or breach of contract

claim against Hal Luftig, individually. Indeed, even though the Luftig Parties filed no less than three motions for summary judgment seeking to have FCP's claims barred by the statute of limitations, at no point in the proceedings did Luftig ever seek to clarify, dismiss, or refute FCP's claim that Luftig and HLC be jointly and severally liable for breach of contract; the Luftig Parties have provided no evidence in their filings with this Court that they ever sought dismissal of the individual claims against Luftig prior to the closing of evidence at the liability hearings.

Then, in the parties' pre-arbitration briefing, both sides acknowledged that the breach of contract and breach of fiduciary duty claims against both Respondents was being tried to the arbitrator. (Action No. 1, Doc. 13-5, p. 19, and Doc. 13-7, p.10). Indeed, in the Luftig Parties' pre-hearing brief, they acknowledged that a breach of fiduciary duty claim was being made against Luftig individually and that the allegations for breach of fiduciary duty arose from the same set of core facts supporting the breach of contract claim. (Action No. 1, Doc. 13-5, p. 19). FCP, in its pre-hearing brief, explained that because Luftig served as the President of FCP, he owed a fiduciary duty to FCP, and that the intentional act of taking and retaining money to which he was not entitled supported a finding that Luftig breached his fiduciary duty. (Action No. 1, Doc. 13-7, pp.10-11). In their pre-hearing brief, the Luftig Parties never contended that there was no factual or legal basis for joint and several liability under either the breach of contract claim or the breach of fiduciary duty claim.

After a four-day arbitration hearing, and nearly a full day of closing arguments, the Arbitrator requested post-hearing briefs. In the Luftig Parties' post-hearing brief, they addressed the fiduciary duty claim. They explained that "*FCP's fiduciary duty claim is derivative of its breach of contract claim, as it is based on the same underlying allegations and asserted injuries*." (Action No. 1, Doc. 13-6, p.16). FCP concurs with this assessment. In its post-hearing brief, FCP

11

contended that because Luftig admitted in cross-examination that he had improperly classified Kinky Boots revenue to be outside the definition of "LLC Income" as contained in Paragraph 6 of the 2007 Agreement (Action No. 1, Doc. 5-2, p.3), that he had admitted to a breach of his fiduciary duty to FCP, _and_ that the damages associated with this breach were identical to the damages suffered by FCP as a result of the breach of contract. (Action No. 1, Doc 13-9, p.3). Specifically, FCP contended in its post-hearing brief that,

> Whether under the theory of breach of fiduciary duty, or breach of contract, the revenues HLC received directly from the various FCP productions was ill-gotten money in violation of the 2007 Agreement which supports an award to FCP for breach of contract and breach of fiduciary duty.

_Id_. Accordingly, there can be no doubt that the parties agreed that FCP was pursuing claims against both Luftig and HLC for breach of contract and against Luftig for breach of fiduciary duty, which would – and in did – properly result in joint and several liability.

### 2. The Arbitrator Appropriately Awarded Damages for Breach of Contract and Breach of Fiduciary Duty Against Luftig and HLC Jointly and Severally.

Following the post-hearing briefing and closing arguments, the Arbitrator issued his Interim Award on liability on July 21, 2021 (Action No. 1, Doc. 13-10, p.10 of 31). In the Interim Award, the Arbitrator addressed the "Claims in Relation to Kinky Boots", in which he explained that FCP alleged "eleven separate counts of breach of contract **and** breach of fiduciary duty." (_Id._ at p. 14 of 31) (emphasis added). Then, in giving background, the Arbitrator acknowledged that the Luftig Parties had taken the position that they were not required to pay post-termination Kinky Boots' income to FCP. The Arbitrator confirmed that FCP contended that this failure to pay Kinky Boots' income was a breach of the 2007 Agreement **and** a breach of fiduciary duty. (_Id._ at p.15 of 31) (emphasis added).

12

After a comprehensive analysis of the 2007 Agreement and the evidence presented at the hearing, the Arbitrator concluded that,

> It appears that it was clear to Luftig that HLC had a legal obligation to pay [FCP] his 55% share of net income from Kinky Boots paid through the Waterfall Provisions of the Paragraph 6 of the 2007 Agreement. It is clear to this Arbitrator that the Respondents are legally obligated to do so. **By failing to do so, I find that the Respondents have breached the Agreement.**

*(Id.* at p.11 of 31) (emphasis added).

In the Interim Award, the Arbitrator did not expressly confirm whether the Luftig Parties' liability arose under the breach of contract claim, the breach of fiduciary duty claim, or both. However, an arbitration award need not be that explicit in order to be confirmed by this Court, provided the Arbitrator did not manifestly ignore the law in rendering his award. To be sure, the Award must be confirmed "if a ground for the arbitrator's decision can be inferred from the facts of the case." *D.H. Blair & Co.*, 462 F.3d at 110 (quoting *Barbier*, 948 F.2d at 121). Here, there was overwhelming evidence presented in the hearing to justify a breach of fiduciary duty finding, and a finding that Luftig breached the 2007 Agreement. Accordingly, the Luftig Parties' argument once again fails and the Final Award should be confirmed.

### 3. *FCP Presented Overwhelming Evidence Supporting the Award of Damages for Luftig's Breach of Fiduciary Duty and Breach of Contract.*

Luftig admitted in cross-examination and in his sworn interrogatories (Gilmore Dec., Ex. 2 – Claimant's Arbitration Exhibit C-118, at response no. 8), that HLC received "back-end points" from multiple productions which it was not entitled to directly receive under the terms of the 2007 Agreement. This admission alone supports the award for breach of contract and breach of fiduciary duty. HLC's receipt of these revenue streams violated Section 6 of the 2007 Agreement which provides that "any cumulative income realized by reason of it acting as an 'introducer' . . .

including sums which would normally be retained by an introducer and not paid over to the introducer's investors, shall be deemed 'LLC Income'" and distributed under the Section 6 waterfall, and constituted a beach of Luftig's fiduciary duty of loyalty as President of FCP.

Additionally, it is undisputed that HLC received revenues directly from production companies in which FCP was the formal "lead producer" to which it was not entitled. The HLC tax returns plainly evidenced direct receipt of revenues that should have been paid directly to FCP as "LLC Income" under the 2007 Agreement. (Gilmore Dec., Ex. 3 – Claimants Arbitration Exhibit C-131). HLC received revenue from productions in which HLC acted as the formal signatory to the production agreements to which it was not entitled, including Catch Me if You Can, Evita, and Kinky Boots. (*Id.*) It is undisputed that HLC received revenues from these productions which were not reported to FCP and were not divided in accordance with Section 6 of the 2007 Agreement.

Lastly, Luftig's own testimony and contemporaneous emails (Gilmore Dec., Ex. 4 – Claimant's Arbitration Exhibit C-23) evidenced his knowledge and understanding that the 2007 Agreement required the revenues from those productions to be subject to the "LLC Income" provisions of Section 6. The Arbitrator agreed that FCP had clearly established that the Luftig Parties were obligated to deliver to FCP 55% of the Kinky Boots income, and that this income constituted LLC Income under the 2007 Agreement. (Action No. 1, Doc. 13-10, p. 20 of 31).

Thus, the Luftig Parties' argument that the Arbitrator must have improperly "pierced the veil" in order to find Luftig personally liable is meritless. The Arbitrator was supplied with sufficient evidence to reasonably have determined that Luftig was a party to the 2007 Agreement and breached it, and/or that Luftig breached his fiduciary duties to FCP.

14

    **4.**    ***The Question to Be Resolved Here is Not Whether the Arbitrator's Decision Was Correct or Incorrect; The Question is Whether the Arbitrator Manifestly Ignored the Law in Finding Joint and Several Liability.***

After the Interim Award was issued, the Luftig Parties raised, for the first time, the issue of the joint and several liability of both Luftig and HLC. This issue was raised in an email correspondence delivered to the Arbitrator on October 20, 2021. (Action No. 1, Doc. 13-11). The correspondence sought clarification of the Interim Award, inquiring whether the Arbitrator had intentionally stated that Luftig and HLC were both liable to FCP for breach. In response, the Arbitrator invited a response from FCP, which was received on October 26, 2021. (Action No. 1, Doc. 13-12). FCP explained two theories supporting the Interim Award's finding of joint and several liability. First, attached to the 2007 Agreement is the "Inducement Letter" signed by Luftig. (Action No. 1, Doc. 5-2 p. 13). FCP contended that the purpose of this letter agreement was to ensure that Luftig perform the personal services he was obligated to perform under the 2007 agreement between HLC and FCP. In the Letter, Luftig confirmed that "If [HLC] should be dissolved or should otherwise cease to exist or for any reason whatsoever should fail, be unable, neglect or refuse to perform and observe each and all of the conditions of the Agreement requiring performance or compliance on its part, at your election, I shall be deemed substituted as a direct party to the Agreement in the place and stead of Lender." (*Id*. at ¶5). Thus, to the extent that HLC failed to perform any portion of the Agreement, Luftig is substituted as a direct party for purposes of the breach. As a result of the Inducement Letter, both HLC and Luftig are jointly and severally liable for the breach.

Secondly, FCP reminded the Arbitrator that Luftig was the President of FCP pursuant to the 2007 Agreement. Thus, he owed fiduciary duties to FCP. Because his conduct caused a breach of the contract, as found in the Interim Award, he is also liable personally for the breach of

fiduciary duty to FCP. The Luftig Parties' provided an extensive argument in response (Action No. 1, Doc. 13-13) to which FCP replied (Action No. 1, Doc. 13-14), after which the Luftig Parties submitted their final contention on the subject (Action No. 1, Doc. 13-15). The same arguments raised in the Luftig Parties' objection to the confirmation of this Award were raised in the post-Award arguments to the Arbitrator. After considering the parties' points and authorities, the Arbitrator confirmed that "the Interim [Award] is correct as written. Both Respondents (i.e. Hal Luftig Company, Inc. and Hal Luftig as an individual) are individually and severally liable for the damages described in my Interim [Award]." (Action No. 1, Doc 13-16).

Whether the Arbitrator determined that Luftig was a party to the 2007 Agreement by virtue of the Inducement Letter, or whether the Arbitrator determined that Luftig should be individually liable for breach of fiduciary duty, there was no manifest disregard of the law. As he did with all issues he adjudicated, the Arbitrator gave thoughtful consideration to the evidence and argument in reaching his findings of fact and conclusions of law. There is no evidence that the Arbitrator simply "dispensed his own brand of industrial justice" without regard for the evidence and applicable law. *Stolt-Nielsen S.A.,* 559 U.S. at 671 (2010). The Luftig Parties have not shown that the Arbitrator erred or that he manifestly disregarded the law. Accordingly, the Final Award must be confirmed.

### B. The Arbitrator Correctly Concluded that Kinky Boots Revenue was "LLC Income" and Kinky Boots was a "Vested Project" Under the 2007 Agreement.

The 2007 Agreement provides that all income realized by FCP through its activities as a general partner, managing member, introducer, shall be deemed "LLC Income" and subject to a distribution waterfall set forth in Section 6 of the Agreement. The Luftig Parties took the position at the arbitration hearing, and continue to espouse the position here, that the Kinky Boots

production revenue (in which Warren Trepp[2] invested and Hal Luftig was credited as one of two co-producers while acting as President of FCP) did not qualify as LLC Income. The Luftig Parties took this position on the basis that HLC, and not FCP, was the signatory on the Kinky Boots Co-Production Agreement (Action No. 1, Doc. 13-4). However, in cross-examination, Luftig's expert admitted that Kinky Boots was originally an "Approved Project" despite the fact that HLC was the formal signatory; he then took the position that Kinky Boots ceased to become an Approved Project when Mr. Trepp's investment was redeemed. (Gilmore Dec., Ex. 8 – Hearing Transcript Excerpts, May 27, 2021, pp. 48-49). Further, the Luftig Parties contended that because the 2007 Agreement was terminated and Trepp's investment redeemed, that Kinky Boots was not a "Vested Project," and thus FCP was not entitled to post-termination revenues under Section 8 of the Agreement. The Arbitrator soundly and correctly rejected the Luftig Parties' contentions. The Arbitrator had substantial evidence supporting the determination, not the least of which is a plain reading of Section 8 of the 2007 Agreement.

### 1.   *Kinky Boots Revenue Was "LLC Income" Under Section 6 of the 2007 Agreement.*

The 2007 Agreement provides that all income realized by FCP as a result of it having "become involved" in a live theatrical production, constitutes "LLC Income." (Action No. 1, Doc. 5-2, at § 6) Section 6 of the Agreement provides that "[a]ny cumulative income realized by the LLC by reason of its acting as a general partner, managing member and/or "introducer," including, without limitation, any executive producer fee, any share of adjusted net profit allocable to producer activities, any cash office charge and any producer royalty, including sums which would normally be retained by an introducer and not paid over to the introducer's investors, shall be

---

[2] Warren Trepp is the Manager of FCP, and his entity is the sole member of FCP.

deemed 'LLC Income,'" and divided and distributed as set forth in the Agreement. The evidence presented at the hearing overwhelmingly established that Luftig repeatedly represented to FCP that all productions in which Luftig was involved were FCP productions, notwithstanding the fact that HLC may have been the signatory on the co-producer agreements. (Gilmore Dec., Ex. 4 – Claimant's Arbitration Exhibit C-23)[3]. Luftig's own emails to Trepp confirmed that Kinky Boots was an FCP project. *Id*. Contrary to the Luftig Parties contentions here (and in the hearing), the decision of Trepp to personally invest or not invest in any production has no bearing on whether the production is an FCP "Approved Project." A project becomes an Approved Project as soon as FCP "become(s) involved with a particular property, stage play and/or musical" with or without a Trepp investment. (Action No. 1, Doc. 5-2, § 4). It is undisputed that FCP "became involved" in Kinky Boots, and that Luftig signed the co-production agreement while acting as the President of FCP. Indeed, Trepp and Luftig are both given credit as producers in the official Kinky Boots playbill. Luftig' email confirms his understanding that a project can be an Approved Project and FCP will receive "billing, tony awards (if we win) royalties, office fees, producer fees, etc while not having to invest any funds ... he can if he wants, but doesn't have to. . . ." (Gilmore Dec., Ex. 4 – Claimant's Arbitration Exhibit C-23).

---

[3]Luftig explained to Trepp's wife in an email that, "Warren can invest as much as he likes, but actually can put in zero and still get all the same stuff. .. same with Kinky Boots and same with First Date and Last Goodbye (two new musicals **we are developing** that Warren will get billing on). I know over the years warren has put SIGNIFICANT money into many, many shows and now **we are at the point** where he can reap all the benefits of doing so. Because we now have all these great relationships and can raise money from outside sources, he will get billing, tony awards (if we win) royalties, office fees, producer fees, etc while not having to invest any funds ... he can if he wants, but doesn't have to ... which is a great thing for us, don't you think?" (emphasis added)

### 2. *Kinky Boots Was a Vested Project Under Section 8(e) of the 2007 Agreement.*

The Luftig Parties also took the position at the arbitration that Kinky Boots was not a "Vested Project" under the 2007 Agreement, and, as a result, FCP was not entitled to the post-termination[4] Kinky Boots revenues. The 2007 Agreement provides that "if at any time following the expiration of the term of this Agreement or the termination of this Agreement any LLC Income is earned with respect to any Approved Project for which a Co-Production Agreement has been signed by the LLC (a "Vested Project"), such net income shall continue to be treated as set forth in paragraph 6 hereof." (Action No. 1, Doc 5-2, §8(e)). Luftig and FCP disputed which productions constituted "Approved Projects" and which constituted "Vested Projects," because those monikers determine FCP's rights to the respective project's post-termination revenue. Luftig still contends that Kinky Boots was not an Approved Project because Trepp's investing entities withdrew their investments after Kinky Boots was formed. As explained above, the 2007 Agreement does not support this contention. Luftig nevertheless contends that Kinky Boots is not a Vested Project because the Kinky Boots operating agreement and co-production agreement were executed by Luftig on behalf HLC and not FCP. In making this assertion, Luftig is admitting that he misappropriated FCP opportunities and breached the most material provisions of the Agreement: (1) which required him to devote his "full time, exclusive services" to FCP as its President, (2) to avoid any personal efforts that are competitive with FCP, and (3) to exploit all production opportunities on behalf of FCP. (Doc 5-2, Section 1) Thus, because Luftig is taking the position that Kinky Boots was not an Approved and Vested Project, he is concurrently conceding that he breached the Agreement by devoting his efforts to an alleged non-FCP production, which violated

---

[4] Luftig terminated the 2007 Agreement effective January 1, 2015.

his exclusive services and non-competition obligations to FCP under Section 1 of the 2007 Agreement; further, he admits that he breached the Agreement by exploiting opportunities on his own behalf in competition with FCP. Thus, any income received by HLC or Luftig on account of his direct competition with FCP would be received in violation of the Agreement and in breach of his fiduciary duties to FCP. In short, if the Arbitrator correctly concluded that Kinky Boots is a Vested Project, then Luftig is liable for all revenues he received for each of the Kinky Boots' productions. If the Arbitrator erred in finding that Kinky Boots is not a Vested Project, then Luftig actively competed with FCP, breached his fiduciary duty, and the revenues he received from Kinky Boots were ill-gotten revenues that belong to FCP. Under either scenario, the evidence clearly established that FCP is entitled to all pre-termination revenue generated by Luftig and HLC, and is entitled to at least 55% of all post-termination Kinky Boots revenue.

The evidence supported the Arbitrator's finding that Kinky Boots was an FCP "Vested Project." In cross examination, Luftig confirmed that in his communications with Trepp when he referred to "we" producing a show or acting as managing member of a production, he meant FCP, including Kinky Boots. (Gilmore Dec., Ex. 5 – Claimant's Arbitration Exhibit C-44) ("Because today is the first preview of **_our_** new musical Kinky Boots here, in Chicago . . .") (*see also* Gilmore Dec., Ex. 6 – Claimant's Arbitration Exhibit C-27) ("per our discussion, here is a (sic) overview of what **_we_** have paid recently in option payments" regarding Kinky Boots expenses) (*see also* Gilmore Dec., Ex. 7 – Transcript excerpts of Luftig cross-examination testimony) ("Q: So, is it a fair characterization, in this context, when you say "we," do you agree or disagree that the conversations that you and Mr. Trepp are having are between the President of FCP and the sole owner of FCP? Is that a fair characterization? A: Yes, yes."). As such, the Arbitrator did not

manifestly ignore the law in finding Kinky Boots to be a "Vested Project" under the 2007

Agreement and the Final Award should be confirmed.

    **3.**  ***The Arbitrator Did Not Manifestly Ignore the Law in Finding That the Parties' Conduct Had Resulted in a Modification of the 2007 Agreement.***

  As the Arbitrator noted in his Interim Award, the Luftig Parties took the position at the

hearing that Kinky Boots was not a Vested Project (subject to a 55% post-termination distribution

of revenue to FCP) because FCP was not the formal signatory of the Kinky Boots Co-Production

Agreement. (Action No. 1, Doc.13-10, p. 9 of 31). Both parties admitted that while the original

intent of the 2007 Agreement was for FCP to be the general partner/managing member for the

future productions, starting as early as the late-2000's with "Catch Me if You Can." Luftig began

using his Company (and party to the Agreement) as the signatory to the production agreements.

(*Id*. at p.19). As the Arbitrator correctly noted, neither party objected to this alteration of the

Agreement for the entire duration of the term of the 2007 Agreement. *Id.* Indeed, Luftig testified

on multiple occasions that it made no difference to him or Mr. Trepp whether FCP or HLC was

the formal signatory of the production agreements, because to him the two entities were

"interchangeable" with respect to the application of the 2007 Agreement. (Gilmore Dec., Ex. 9 –

Luftig Transcript Excerpts, May 27, 2021). Luftig further confirmed that with respect to Kinky

Boots, although HLC was the formal signatory of the co-production agreement, the revenues

received by HLC were "passe[d] through FCP according to the 2007 Agreement." (Gilmore Dec.,

Ex. 10 – Luftig Transcript Excerpts, May 25, 2021) ("Yes, what he just stated prior, the [Kinky

Boots] money is supposed to go into HLC first then it gets passed to FCP"). When Trepp's counsel

followed up on that testimony the next day, Luftig was asked the question: "You don't deny that

at the time that all these communications (in reference to Gilmore Dec., Ex. 4, Claimant's hearing

exhibit #23) were occurring, you considered the, 'we,' to be HLC and FCP Entertainment,

irrespective of whose signature showed up on what document; is that correct?" Luftig responded simply, "Correct." (Gilmore Dec., Ex. 11 – Luftig Transcript Excerpts, May 26, 2021).

As the Arbitrator noted, Luftig attempted to reconcile his comments that he always viewed HLC and FCP as "interchangeable" as it pertained to the signatures on the production agreements with the fact that in the arbitration hearing the Luftig Parties were contending that the payment of any Kinky Boots revenues to FCP were a "mistake" and an incorrect interpretation of the 2007 Agreement. (Action No. 1, Doc. 13-10, p.19 of 31). The Arbitrator rejected this argument, concluding correctly that despite the fact that HLC – not FCP – was the signatory to the Kinky Boots co-production agreement, the parties had knowingly and willingly developed a "course of performance" in which both parties had modified the terms of the 2007 Agreement to suit them. *Id*. The arbitrator cited Claimant's arbitration hearing Exhibit C-23 (Gilmore Dec., Ex. 4) as evidence in support of his conclusion.

While it is true that FCP agreed that the 2007 Agreement had never been modified by a signed writing, FCP's primary position as it pertained to the Kinky Boots revenue was that irrespective of which entity signed the production agreements, Kinky Boots was an Approved Project prior to the termination of the 2007 Agreement, and therefore, because a co-production agreement had been signed, Kinky Boots was a "Vested Project" and the Luftig Parties owed FCP 55% of the post-termination revenues. The Arbitrator agreed. (Action No. 1, Doc.13-10, p. 20 of 31).

In finding that the parties' course of performance supported the conclusion that Kinky Boots was a Vested Project, the Arbitrator cited relevant California authorities supporting his conclusion, including *Diamond Works v. Agreement Insurance*, 109 Cal. App.4th 1020, 1038 (2003), which provides that the Court can infer a modification of the agreement where, as here,

the parties' subsequent conduct was inconsistent with the express provisions of the agreement. (Action No. 1, Doc.13-10, at p. 19 of 30). The Luftig Parties quarrel with the Arbitrator's conclusions, contending that it was improper to find an amendment to the 2007 Agreement where no party had expressly contended that a written amendment to the Agreement had been made. Again, however, this Court does not act as an appellate court to review the wisdom of the Arbitrator's conclusions on what California law provides. Rather, this Court must only ensure that no manifest disregard of the law has occurred. Here, the Arbitrator was right to conclude that the parties had agreed that a Vested Project exists irrespective of which entity signed the production agreements. There was no manifest disregard of the law and the Final Award should be confirmed.

### C.   The Arbitrator Did Not Manifestly Ignore the Law In Finding That The 2007 Agreement Was Not Void as Against Public Policy Pursuant to California Business and Professions Code §16600.

For the first time during closing arguments, the Luftig Parties argued that the entire 2007 Agreement was void as against California public policy because it contained an impermissible "non-compete" restriction against Luftig in violation of §16600. (Action No. 1, Doc 13-10, p. 11 of 31). The Arbitrator asked for this issue to be included in the parties' post-hearing briefs. Both sides submitted comprehensive arguments addressing the §16600 issue. (FCP's post-hearing brief is attached to the Gilmore Dec. as Ex. 12). In its brief, FCP argued that the California Supreme Court held in the case of *Ixchel Pharma LLC v. Biogen, Inc*., 9 Cal. 5th 1130 (2020), that not all commercial contracts between businesses are void under §16600, but should be reviewed subject to the "Rule of Reason" standard. This standard, as the Arbitrator correctly noted, "asks whether the agreement unreasonably suppresses competition by considering the circumstances, details, and logic of the restraint." (Action No. 1, Doc. 13-10, p. 12 of 31). Applying this standard, the

Arbitrator engaged in a lengthy and comprehensive analysis of why the 2007 Agreement's "exclusivity" language is not invalid under the "Rule of Reason. (*Id*. at pp. 12-14).

Moreover, the Arbitrator further explained that although he was not inclined to exclude the arguments for being untimely raised, he was rejecting the arguments on basis that the Luftig Parties simply "failed to offer any evidence at arbitration to support the factual inquiry into whether the restrictions in the 2007 Agreement were 'unreasonable restraints on trade' under *Ixchel*." (*Id*. at p.14 of 31). Accordingly, the Luftig Parties §16600 argument also failed because they failed to put on any evidence in support of their contention that the 2007 Agreement violated §16600. The Arbitrator did not manifestly ignore the applicable law here. To the contrary, he correctly interpreted and applied California's mandatory §16600 jurisprudence and correctly noted that the Luftig Parties failed their evidentiary burden to establish unreasonableness. The Luftig Parties' arguments are without merit and the Final Award should be confirmed.

## V.    Conclusion

For the reasons set forth above, it is clear that there is no evidence that the Final Award is the result of a manifest disregard of the law and as such, the Court "must" under the clear legal standard of the FAA, confirm the Final Award.  Accordingly, FCP respectfully requests that the Court grant its Petition to Confirm the Final Award in Action No. 1 and dismiss Luftig's Petition to Vacate the Final Award in Action No. 2.

Dated: June 13, 2022

Respectfully submitted,

LIPPES MATHIAS LLP

By: */s/ Richard M. Scherer, Jr.*
Richard M. Scherer, Jr.
50 Fountain Plaza, Suite 1700

Buffalo, NY 14202
P: 716-853-5100
F: 716-853-5199
E: rscherer@lippes.com

*Attorneys for FCP Entertainment Partners, LLC*